UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>       v.<br><br>EVOLV TECHNOLOGIES HOLDINGS, INC.,<br>a corporation,<br><br>    Defendant. | **Case No. 1:24-cv-12940**<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action for Defendant's violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). For these violations, the FTC seeks relief, including a permanent injunction and other relief, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

2. Evolv Technologies Holdings, Inc. ("Evolv") has made false or unsupported claims about its security screening system, Evolv Express ("Express"), in use at the entries of thousands of schools and other venues across the country. The company has misrepresented the extent to which the system will detect weapons and ignore harmless items. Evolv has made unsupported claims that its technology, which incorporates artificial intelligence, makes its system more accurate, efficient, and cost-effective than traditional metal detectors. It has implied falsely or without adequate substantiation that users can avoid the trade-offs between a highly secure screening process and a seamless experience for those entering a venue. However, the extent to which Evolv's scanners will detect weapons depends largely on the sensitivity level set by the user, with higher sensitivity levels meaning more false alarms.

3.    In its marketing efforts, Evolv has specifically targeted public school systems. However, when tested and when deployed at schools, Express has sometimes failed to alarm on dangerous weapons but has alarmed on harmless items that students often bring to school. These issues have led Evolv to suggest new options for school customers – such as a higher sensitivity setting and installation of conveyor belts – that reduce further the likelihood that such customers will enjoy the claimed benefits of Express as compared to traditional metal detectors. Evolv has made millions of dollars via the sale of Express to an increasing number of school districts nationwide.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

5.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (b)(3), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

6.    The FTC is an independent agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

## DEFENDANT

7.    Defendant Evolv Technologies Holdings, Inc. ("Evolv"), is a Delaware Corporation with its principal place of business at 500 Totten Pond Road, 4th Floor, Waltham, MA 02451. Evolv transacts or has transacted business in this District and throughout the United

States. At all times relevant to this Complaint, acting alone or in concert with others, Evolv has advertised, marketed, distributed, and sold security screening systems throughout the United States.

## COMMERCE

8.      At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

9.      Since 2019, Defendant has advertised, offered for sale, sold, and distributed Evolv Express, a security screening system intended to detect whether people are bringing weapons into various buildings and venues, including schools.

10.     Evolv represents that its scanners use low-frequency electromagnetic fields and sensors to detect concealed weapons as people walk through the scanners.

11.     Evolv states on its website and elsewhere that Express is "AI-driven," is "AI-based," is "AI-powered," uses "proven artificial intelligence," and uses a software platform and equipment that enables the system to spot potential threats and let security guards know the location of that threat on people or in their bags.

12.     For Evolv, marketing its product as involving the use of AI is a very deliberate choice. In a March 23, 2023, email from an Evolv manager to media consultants, she noted the need to "emphasize AI is important as AI is really what distinguish[es] us from competitors."

13.     Evolv has positioned itself as a high-tech alternative to traditional metal detectors. The company has insisted publicly and repeatedly that Express is a "weapons detection" system

and not a "metal detector." This representation is a solely a marketing distinction, in that the only things that Express scanners detect are metallic, and its alarms can be set off by metallic objects that are not weapons.

14.    Express customers choose between several sensitivity settings that will change how often the system will detect potential weapons. At higher sensitivity settings, the system will catch more potential weapons but will also alarm more often on harmless personal items. At lower sensitivity settings, the system will catch fewer potential weapons but will alarm less often on harmless personal items.

15.    Evolv uses a multi-year, subscription-based sales model. The subscription contracts contain no right of cancellation. While the cost depends on the subscription terms, add-ons, and the number of venues covered, customers generally pay several million dollars for Express systems. For example, in early 2023, one school board entered into an $8 million, four-year contract with Evolv.

**School Customers**

16.    Evolv has specifically targeted schools, sports stadiums, and hospitals for sales, stating, in its 2022 Annual Report, that its "most significant opportunities … in the near term are in education, healthcare and professional sports. The education market remains exceptionally large with nearly 130,000 schools across the United States. Gun violence remains a top issue for district leadership, school administrators, parents, teachers and students." Evolv also stated in that report that it was "now operating in over 400 school buildings in the United States, up from about 20 school buildings at the end of 2021," and that "Express can now be found in 8 of the 100 largest school districts in the country."

17.     In a February 2024 article in Forbes, an Evolv executive said that Express was in 700 school buildings in 40 states, that 325,000 students pass through Express scanners daily, and that schools represented 50% of Evolv's business. According to Evolv's website, as of June 2024, Express was in over 800 school buildings in the United States.

18.     Evolv has marketed its product as an answer to the problem of guns and other weapons in schools. In an August 17, 2022, email with media consultants, Evolv's Vice President for Corporate Communications discussed public messaging to educators, parents, and others, noting that, "While this is about fear and anxiety, we want to get across how impactful the peace of mind piece is in having weapons-free zones (secured by Evolv)." Evolv has also redirected people to its website via the domains schoolshootingforum.com and schoolshootingforum.org.

19.     When tested and deployed at schools and elsewhere, and at various sensitivity settings, Express has failed to alarm on some weapons, including guns and knives.

20.     In October 2022, at a school in New York, a student was stabbed by a 7-inch knife that reportedly passed through an Express scanner. At other times in the same school system, Evolv scanners failed to detect an off-duty policeman's service weapon but did raise an alarm for a student's lunchbox. After the stabbing incident, school officials raised the sensitivity settings, doubling the false alarm rate to 50%.

21.     When tested and deployed at schools and elsewhere, and at various sensitivity settings, Express has alarmed often on harmless personal items, including Chromebooks, binders, water bottles, and other items that students often bring to school.

22.     In some schools that use Express, students have been instructed to remove Chromebooks and certain other items from their bags and hold them in certain ways to avoid false alarms when the students pass through the scanners.

23.     Some schools have had to hire or use additional personnel to monitor the process of students proceeding through Express scanners at school opening times.

24.     In 2023, Evolv introduced a more sensitive setting, "G," for Express users, with the stated aim of detecting more knives, but admitting that, at this new setting, some knives will still be missed, more false alarms will occur, additional staffing may be required, and fewer people can pass through the scanners in a given time period.

25.     In 2023, with the stated aim of reducing false alarms in schools, Evolv started recommending to its school customers that they deploy an alternative to having people walk through Express scanners with their personal items. It recommended instead that such customers either use (1) conveyor belts on which students can place various personal items or (2) a table and a "pass-around" process by which various personal items are diverted by hand around the scanners.

**Marketing Claims**

26.     Evolv markets Express through its website and via other forms of digital marketing. It has also marketed directly to school systems and has targeted particular school officials, including in connection with bids for contracts to provide security screening systems.

27.     To induce the purchase of Express, Defendant has disseminated or caused to be disseminated advertisements and promotional messages or materials that contain the following statements, among others:

A.    From at least August 2022 to October 2022, the homepage of Evolv's website, https://www.evolvtechnology.com, featured the prominently placed phrase "Weapons-Free Zones," as seen in this example from October 13, 2022:



B.    From at least November 2022 to January 2023, the homepage of Evolv's website featured the similarly, prominently placed phrase "safe zones," as seen in this example from January 4, 2023:



C.      From at least March 2023 to January 2024, an Indiana-based Evolv reseller, Tri-Electronics, has used https://www.weaponsfreezones.com/ as the URL of its website and has featured the prominently placed phrase "weapons-free zones" on its homepage;

D.      From at least August 2021 to January 2024, the homepage of Evolv's website has represented that Express will give security teams "the assurance that they can reliably pinpoint and stop threats";

E.      In its "Transforming Human Security eBook," available on its website since at least 2021, Evolv has stated that Express will "[s]pot threats while ignoring harmless personal items" and that there is "[n]o stopping, emptying pockets, or removing bags";

F.      On the "Schools" page of its website, Evolv has represented, from at least May 2021 to May 2023, that students can walk through "without stopping, emptying their pockets or bags, or waiting in line" while still being protected from concealed weapons, as seen in this example from October 26, 2022:



G.      On the homepage of its website, from at least August 2021 to October 2022, Evolv represented that customers could avoid a trade-off between security procedures that stop threats and a seamless visitor experience, as seen in this example from October 23, 2022:



H.      Near the top of the "FAQ" page of its website, Evolv has represented, from at least October 2021 to January 2024, that, "Using advanced sensors and

artificial intelligence (AI)," its products "screen everyone who enters a venue – without the need to hand over their belongings or even slow their pace";

I.      In an Express marketing email dated February 2, 2022, and sent to an official at a school district in California, Evolv stated that it would improve security staff efficiency "while eliminating false positives when screening";

J.      In an Express "sole source" document signed on June 2, 2022, and submitted in connection with a contract with a Maryland school district ("Maryland sole source document"), Evolv touted "low nuisance alarm rates" and its "Frictionless Screening: No stopping is required. No emptying pockets or removing bags. Groups of people screened simultaneously; personal items do not require removal.";

K.      In an Express marketing email dated September 3, 2022, and sent to an official at a school district in California, Evolv stated Express "detects weapons while ignoring harmless personal items and allowing visitors to walk through at a natural pace";

L.      In a "Guide to Getting to Know Your Child's School Security Screening System" (hereinafter "Parent Guide"), dated October 2022, and made available to parents of children attending schools at which Express was installed, Evolv states that "Express uses artificial intelligence and sensor technology to instantly distinguish a phone or personal item from a potential weapon or component of a weapon" and that students can "[w]alk through at the pace of life without always stopping, removing coats or backpacks, or emptying pockets";

M.      In a marketing video, "Experience It OnDemand," available on Evolv's

website at relevant times including November 2022, Evolv represents that

Express "[d]etects weapons and ignores harmless items," and that people walk

through "with bags and pockets intact" [video capture Nov. 10, 2022]:



N.      On the homepage of its website, including from at least August 2021 to

October 2023, Evolv made implied, favorable comparisons of Express to

traditional metal detectors, including via representations that Express offers the

"highest degree of weapons detection accuracy," provides "[m]ore accurate threat

detection," and "helps to provide the safest possible venue entry";

O.      From at least August 2021 to June 2023, the homepage of Evolv's website

has represented that Express "drastically reduces false alarm rates" in contrast

with "traditional security screening";

P.      From at least October 2019 to August 2022, the homepage of Evolv's website has represented that Express provides "10X Faster Throughput" or is "10x faster than metal detectors";

Q.      On the "Express" page of its website, Evolv has represented, from at least February 2020 to January 2024, that Express is "10x faster than metal detectors" or "almost 10X faster than metal detectors" or has "10X Faster Throughput than Traditional Checkpoints";

R.      On the "Schools" page of its website, Evolv has represented, from at least May 2021 to October 2023, that Express is "10x faster than metal detectors" and has "10x the flow of metal detectors";

S.      In the 2022 Maryland sole source document, Evolv represents that Express is "10X Faster than metal detectors";

T.      In several Express marketing emails sent in September 2022 to a California school official, Evolv stated that Express will process "10x more people," "outperforms legacy metal detectors with flow that is 10x faster," and allows customers to "Experience Security Screening That's 10X Faster";

U.      In the Parent Guide, Evolv represents that Express is "10X faster than metal detectors";

V.      From at least September 2020 to June 2022, the homepage of Evolv's website has represented that Express will provide customers with either "70% less labor cost than metal detectors or "70% lower cost";

W.      From at least November 2021 to January 2024, the "Virtual Demo" page

of Evolv's website represents that Express will "reduce labor costs by up to 70%;

X.      In the "Experience It OnDemand" video, an Evolv representative states

that Express "uses less frontline staff labor to operate and the overall expense is

up to 70% less than walk-through metal detectors";

Y.      On the "Schools" page of its website, Evolv has represented, from at least

May 2021 to October 2023, that the use of Express means "fewer staff members

are required to operate the system" or "far fewer staff and systems are needed."

28.     In a press release issued on February 20, 2024, and appearing on its website,

Evolv represented that government agencies in the United States and the United Kingdom have

tested Express and "concluded that [it] was highly effective at detecting firearms and many other

types of weapons."

29.     In a March 2022 blog post, Evolv discussed the results of a report on Express by

the National Center for Spectator Sports Safety and Security (NCS[4]), stating that the results

"provide third party validation . . . that Express offers an unmatched combination of high-

performance weapons detection, low alarm rates," and that "[h]aving a trusted, fully

independent third party available to stress test our product in real-world environment is an

incredibly valuable asset."

30.     Defendant has not conducted testing, has not had Express tested by United States

or United Kingdom government agencies, and does not otherwise possess studies that

substantiate the marketing claims described above and in Count One below.

31.    In touting the NCS[4] report, Defendant did not disclose to consumers that Evolv's relationship with NCS[4] included: working with NCS[4] on the test design for the report; working with NCS[4] on changes to the report, including removal of negative information about Express's ability to detect certain weapons; and sponsoring luncheons at NCS[4] conferences.

32.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things: Defendant has engaged in its unlawful acts and practices repeatedly over a period of several years; Defendant has engaged in its unlawful acts and practices knowingly; Defendant is continuing to exercise contracts won through the deceptive acts and practices alleged in this complaint without giving customers an opportunity to withdraw from the contracts, thereby implicitly threatening to enforce the contracts against those customers; Defendant has earned significant revenues from participating in these unlawful acts and practices; Evolv remains in business and maintains the means, ability, and incentive to continue its unlawful conduct; and Evolv has changed its marketing claims over time and can change such claims at any time in the future.

## **VIOLATIONS OF THE FTC ACT**

33.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

34.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### **Count I**

**False or Unsubstantiated Efficacy Claims**

35.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Evolv Express, Defendant has represented, directly or indirectly, expressly or by implication, that:

A.     Evolv Express will detect all weapons;

B.     Evolv Express will ignore harmless personal items;

C.     Evolv Express will detect all weapons while ignoring harmless personal items;

D.     Evolv Express will ignore harmless personal items without requiring visitors to remove any such items from pockets or bags;

E.     Evolv Express detects weapons more accurately than metal detectors;

F.     Evolv Express drastically reduces false alarm rates as compared to metal detectors;

G.     Evolv Express screens visitors ten times faster than metal detectors; and

H.     Evolv Express reduces labor costs by up to 70% compared to metal detectors.

36.     The representations set forth in Paragraph 36 are false or misleading or were not substantiated at the time the representations were made.

37.     Therefore, the making of the representations as set forth in Paragraph 37 of this Complaint constitutes a deceptive act or practice, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Failure to Disclose Material Information**

38.     In connection with the advertising, marketing, promotion, offering for sale, or sale of Evolv Express, Defendant has represented, directly or indirectly, expressly or by implication, that the NCS[4] report regarding the testing of Express was independent and provided third-party validation of Express' ability to detect weapons.

39.     When Defendant has made the representations described in Paragraph 39, Defendant failed to disclose to consumers that Evolv's relationship with NCS[4] included: working with NCS[4] on the test design for the report; working with NCS[4] on changes to the report, such as removal of negative information about Express' ability to detect certain weapons; and sponsoring luncheons at NCS[4] conferences. This additional information would be material to consumers in deciding to purchase, or in their use of, Express.

40.     In light of the representations described in Paragraph 39, Defendant's failure to disclose the material information as described in Paragraph 40 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

41.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act; and

B.     Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: November 26, 2024                    s/Michael Atleson
                                            MICHAEL ATLESON (NY Bar # 2705762)
                                            matleson@ftc.gov; 202-326-2962
                                            KATHERINE CAMPBELL (OR Bar # 071044)
                                            kcampbell@ftc.gov; 202-549-0519
                                            Federal Trade Commission
                                            600 Pennsylvania Avenue, NW
                                            Washington, D.C. 20580

                                            Attorneys for Plaintiff
                                            FEDERAL TRADE COMMISSION